**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KEITH LAVORGNA, | ) |
| | ) |
| Plaintiff, | )    2:16-cv-00491 |
| | ) |
| v. | )    Judge Mark R. Hornak |
| | ) |
| NORFOLK SOUTHERN CORPORATION, | ) |
| | ) |
| Defendant. | ) |

## OPINION

**Mark R. Hornak, United States District Judge**

Plaintiff Keith Lavorgna ("Lavorgna" or "Plaintiff"), applied for leave under the Family

Medical Leave Act (FMLA) while employed by Defendant Norfolk Southern Corporation

("Norfolk" or "Defendant"). Norfolk determined that Lavorgna had falsified his FMLA

certification form and terminated his employment. Lavorgna filed claims for unlawful

discrimination under the Americans with Disabilities Act (ADA) and retaliation under the FMLA.

Norfolk contends that Plaintiff was terminated for a nondiscriminatory reason and that the Plaintiff

cannot demonstrate that its reasons for his dismissal are pretextual. It then moved for summary

judgment on those grounds, asserting that there are no genuine issues of material fact and that it is

entitled such judgment in its favor.

For the reasons which follow, Defendant's Motion is granted as to all claims, and summary

judgment is entered in favor of Defendant.

## I.    BACKGROUND

Plaintiff suffers from severe migraine headaches. (Keith Lavorgna Dep. 26:2–18, ECF No.

26-1.) He takes medication for his migraine episodes. (*Id.* at 28:6-11.) Plaintiff became a Norfolk

employee in 2005. (Compl. ¶ 8, ECF No. 1; Answer ¶ 3, ECF No. 9.) At the time of his hiring,

1

Plaintiff's managers and supervisors were not aware that he suffered from severe migraine headaches. (Keith Lavorgna Dep. 29:15–25, ECF No. 26-1.) After an annual safety meeting in 2009, Plaintiff asked a trainmaster what he should do if he had to "take medication for anything." (*Id.* at 26:09–18.) The trainmaster did not want him working while medicated and told him, "[I]f you have to mark off, we have an extra board that covers you. Don't worry about that. We want you to be focused at work and not tear things up or damage things or get someone hurt." (*Id.* at 67:4–10.) He asked Plaintiff, "Did you apply for FMLA?" (*Id.* at 26:19–20.) Plaintiff had not, but subsequently submitted an FMLA leave application and that application was approved. (*Id.* at 27:3–5.)

APS Healthcare ("APS"), a separate company, manages administration of FMLA requests from Defendant's employees on behalf of Defendant. (Concise Statement of Material Facts ("CSMF") ¶ 12, ECF No. 25.)[1] Neither Norfolk nor any of its own employees or supervisors review or approve FMLA leave applications or requests. (*Id.* ¶¶ 12, 17; Hugh Dodd Dep. 8:10–14, ECF No. 26-2.) Plaintiff's FMLA leave application was approved by APS without any issues annually from 2009 or 2010 until 2015, when Plaintiff submitted the application at issue here. (CSMF ¶ 13, ECF No. 25.) Plaintiff took FMLA leave of ten (10) days in 2013 and fourteen (14) days in 2014. (CSMF ¶¶ 14–15, ECF No. 25.) Plaintiff's FMLA leave was unpaid. (Keith Lavorgna Dep. 66:21–25, ECF No. 26-1.) Defendant never criticized nor otherwise took any action toward Plaintiff in response to any of his FMLA-covered absences. (CSMF ¶ 16, ECF No. 25.)

---

[1] Defendant filed a concise statement of material facts as required by both Federal Rule of Civil Procedure 56 and this Court's Local Civil Rule 56. Plaintiff did not file a counterstatement of material facts. By virtue of both Rules, this Court is to treat the statement of facts submitted by Defendant as admitted for purposes of resolving this Motion and it does so here. *See Donahue-Cavlovic v. Borough of Baldwin, et al.*, No. 15-cv-1649, 2017 WL 4862072, *1, n. 1 (W.D. Pa. Oct. 26, 2017).

Plaintiff did not take any FMLA leave after December 2014 and did not attempt to renew his FMLA application until July 2015, seven months later. (Keith Lavorgna Dep. 31–33, ECF No. 26-1.) On the bottom of Plaintiff's FMLA application, the pre-printed "Failure to Comply with FMLA Responsibilities" section states,

> [Y]ou are responsible for ensuring that the information and documentation provided to support your need for FMLA leave is accurate. Any misuse of FMLA leave, failure to timely provide a completed medical certification, failure to comply with applicable call-in procedure or providing inaccurate information in support of FMLA leave may subject you to handling under applicable disciplinary and/or absenteeism policies.

(ECF No. 26-1, at 92.)

On July 7, 2015, Plaintiff went to his physician, Dr. York at Lakeside Primary Care, to have the doctor fill out the Certification of Healthcare Provider (CHP) form for FMLA leave. (Keith Lavorgna Dep. 33:21–24, ECF No. 26-1; ECF No. 26-1, at 93.) Instead of being seen by Dr. York, Plaintiff was seen by a physician assistant, Samantha Morgan, who had never before filled out an FMLA application. (Keith Lavorgna Dep. 33:24–34:7, ECF No. 26-1.) Plaintiff told Morgan that he suffered from migraines once or twice month. (Keith Lavorgna Dep. 27:19–20, ECF No. 26-1.) Morgan filled out the CHP form and faxed it to APS on July 7, 2015. (ECF No. 26-1, at 93, 94.)

On July 15, 2015, APS sent Plaintiff a letter informing him that his FMLA application was '[i]ncomplete or [d]eficient." (ECF No. 26-1, at 94.) The letter stated in relevant part, "[Y]ou must provide the following item(s): 1. The certification is missing required information. 2. Other Reason: Section 3b and 5 are incomplete. All additions/corrections must be dated and initialed by the health care provider." (*Id.*) APS gave Plaintiff twelve (12) days to cure the deficiencies. (*Id.*) Plaintiff failed to return his FMLA request to APS before the deadline. (Keith Lavorgna Dep. 34:18–21, ECF No. 26-1.) On July 27, 2015, APS sent Plaintiff a letter stating, "[Y]ou do not

3

qualify for Family and Medical Leave at this time due to: . . . Your provider certification was incomplete and you did not submit a completed certification in a timely manner. Your request for family/medical leave cannot be certified without this information." (ECF No. 26-1, at 95.) Plaintiff did not receive the July 27th letter. (Keith Lavorgna Dep. 36:4–5, ECF No. 26-1.)

After Plaintiff received the July 15th letter, he placed that letter on his kitchen table and traveled to work at different terminals for Norfolk. (*Id.* at 37:20–24.) On July 31, 2015, Plaintiff took the prior CHP form APS attached to the July 15th letter back to his doctor's office. (*Id.* at 37:25–38:25.) The receptionist told Plaintiff to wait in the lobby and returned the form to him after about forty (40) minutes with Morgan's signature. (*Id.*) Plaintiff put that form on his kitchen table and proceeded to again travel for work. (*Id.* at 39:18–21.) He called APS to get its address on August 7, 2015. (ECF No. 26-1, at 168.) APS received the amended form from Plaintiff on August 10, 2015. (*Id.*)

## A. The July 7 and August 10 Versions of the CHP Form

On the original form Morgan faxed to APS on July 7, Plaintiff filled out the top two lines, which contain the employee's name and ID number, the patient's name (if different than the employee) and date of birth, and the relationship of the patient to the employee. (ECF No. 26-1, at 132, 164.) Plaintiff also wrote "migraines" in response to the question "What are the medical facts that support the patient's serious health condition?" in section 3a and "impedes ability to do job" in response to the prompt "Please indicate type of leave the Employee needs for the serious health condition stated in Section 3" in section 6. (*Id.* at 93, 132 (emphasis omitted); Keith Lavorgna Dep. 43:10–12, ECF No. 26-1.)

The "amended" CHP form, received by APS on August 10, was significantly altered to include information beyond what APS sought in its July 15th letter. (ECF No. 26-1, at 96.) Section

4

3a was updated to read "migraines—impedes ability to do job" instead of simply "migraines" as it read in the initial July 7th form submitted to APS. (*Id.*) Section 5 was updated to state that Lavorgna's migraines required two medical visits a year. (*Id.*) This section had been left blank in the July 7th form. (*Id.* at 93.) Section 6 was changed to indicate that Plaintiff suffered four to six such episodes a month requiring "one/two" days off for each episode. (*Id.* at 96.) The July 7th form, however, had only stated that he suffered one to two such episodes a month requiring one day off each episode. (*Id.* at 93.) Lastly, the physician's assistant's title was filled in and initialed at the bottom of the form Lavorgna mailed to APS, which APS received on August 10. (*Id.* at 96.) That field had been left blank on the original July 7th form. (*Id.* at 93.)

## B. APS's Response

On August 14, 2015, an APS employee entered notes into Lavorgna's APS file about the differences between the original certification form and the amended version:

> [S]ection 3c and 3d remain as previous, frequency/duration changed to 4-6x per month for one/two days but only initials in section 12 where . . . specialty added.

(ECF No. 26-1, at 168.) APS's employee "Getten" spoke to Morgan and concluded,

> [she] was very receptive and stated the form was brought in with a star in section 12 stating she needed to provide her specialty (this was not addressed in cure sent) and this was all that she provided, did NOT change freq/duration.

(*Id.*) APS faxed the amended August 10th certification form it received from Plaintiff to Morgan for her "review/verification of changes." (*Id.*) On August 18, 2015, another APS employee entered notes into APS's file about a conversation he/she had with Norfolk:

> [I]nformed [Norfolk] that it appears [Lavorgna] altered med[ical] cert[ification]
> . . . .

(*Id.*) On August 20, 2015, Morgan sent APS a letter in response to its inquiry. Morgan stated,

5

I did not adjust this patient[']s FMLA papers in regards to writing 4-6 episodes per month for migraines. The only correction I made on 7/31/15 was writing "Physician Assistant" under field of specialization with my initials "SM" and date "7/31/15."

(*Id.* at 97.)

## C. Norfolk's Response

Norfolk's Labor Relations department sent Plaintiff's supervisor, Hugh Dodd, "information that pertained to Mr. Lavorgna's FMLA submissions and information from the healthcare provider stating that they had not made specific changes." (Hugh Dodd Dep. 17:16–18:9, ECF No. 26-2.) The information included Morgan's letter. (*Id.* at 18:24–25, 21:12–15.) On August 21, 2015, Dodd charged Plaintiff with falsifying his FMLA documents and relieved him of his duties without pay until an investigation concluded. (Keith Lavorgna Dep. 25:18–19, ECF No. 26-1; ECF No. 26-1, at 98.) As the charging officer, Dodd was responsible for showing that the charges were accurate. (Hugh Dodd Dep. 7:14–21, ECF No. 26-2.) Mr. Dodd did not know that Plaintiff suffered a serious medical condition before charging him. (*Id.* at 29:7–17.) Dodd charged Plaintiff under Norfolk General Conduct Rule 900 and the general notice printed on the Norfolk employee rule book. (Hugh Dodd Dep. 26:20–29:3, ECF No. 26-2.) Rule 900 states:

GENERAL CONDUCT REGULATIONS

900. Employee Conduct
Employees are to conduct themselves in a professional manner and not engage in behavior or display material that would be considered offensive or inappropriate by co-worker, customers, or the public. Offensive or inappropriate behavior includes making disparaging remarks, telling jokes, or using slurs concerning race, religion, color, national origin, gender, age, veteran status, sexual orientation, disability or any other legally protected status. Offensive or inappropriate material includes that which is sexually explicit or insulting to individuals because of race, religion, color, national origin, gender, age, veteran status, sexual orientation, disability or any other legally protected status.

Upon discovery, offensive or inappropriate material must be removed immediately from Company property by its owner, or if the owner is unknown or fails to remove it, must be destroyed.

(ECF No. 26-2, at 55 (emphasis omitted).) The general notice states,

## GENERAL NOTICE

Safety is of the first importance in the discharge of duty.

Obedience to the rules is essential to safety.

Willingness to obey the rules is necessary in order to enter or remain in the service. Past practices not in conformity with the rules are unacceptable as an excuse for noncompliance.

The service demands the honest, intelligent, and courteous discharge of duty.

To obtain promotion, ability must be shown for greater responsibility.

Safety and General Conduct Rules have evolved from the experience of many people on many railroads over many years. This process will be continuing, and constructive suggestions to improve these rules should be submitted to officers of the Company.

(ECF No. 26-2, at 54 (emphasis omitted).)

On the same day, Norfolk sent Plaintiff a letter requesting his presence for an investigative hearing, required by the collective bargaining agreement with his Union, in connection with "[c]onduct unbecoming an employee" for falsifying information on his "application for coverage under the Family and Medical Leave Act, submitted on August 7, 2015.[2] These incidents occurred while [he worked] as [an] Engineer Trainee in Powhatan, Ohio." (ECF No. 26-1, at 98; Keith Lavorgna Dep. 46:23–47:4, ECF No. 26-1.)

The bottom of that letter read, "Additionally, in accordance with the agreement, you are advised that you have the option to waive the investigation." (ECF No. 26-1, at 98.) Plaintiff interpreted this waiver to mean that if he accepted responsibility, he would not have a hearing and would only be suspended. (Keith Lavorgna Dep. 55:11–17, ECF No. 26-1.)

---

[2] Received by APS on August 10, 2015.

Sometime after August 21, 2015, Plaintiff spoke to Dr. York about the certification and Morgan's letter. (*Id.* at 63:14–64:12.) Dr. York told him, "[Morgan] did not do anything other than put her certification on there." (*Id.* at 64:2–4.)

## D. Internal Hearing

At Plaintiff's hearing on August 26, 2015 (held five days after Dodd relieved him from duty), Robert Williams, the Local Chairman for SMART (Plaintiff's union) and a conductor for Norfolk, represented him. (*Id.* at 47; ECF No. 26-1, at 103.) Mark Wagner, the Hearing Officer, presided over Plaintiff's hearing. (ECF No. 26-1, at 100.) Plaintiff had not met Wagner before the hearing and did not have any problems with him in the past. (Keith Lavorgna Dep. 47, ECF No. 26-1.) Plaintiff told Williams he would not accept the waiver because he "didn't do anything wrong." (*Id.* at 56, ECF No. 26-1.) Notwithstanding Plaintiff's declination, Dodd stated that the waiver was a misprint and he had so notified Plaintiff days before the hearing. (Hugh Dodd Dep. 24, 33, ECF No. 26-2.) Moreover, according to Dodd, accepting a waiver meant an employee "did effectively do what they were being charged with in accepting the discipline that was being offered in the waiver." (*Id.* at 32.) Plaintiff would not have ordinarily been offered a waiver, according to Dodd, because the discipline for his offense is termination and employees don't generally sign waivers to be terminated. (*Id.* at 33.)[3]

As the charging officer, Dodd "present[ed] the Rules of Conduct, the allegations, and any evidence at the time of the investigative hearing" that supported the charge against Plaintiff. (*Id.* at 35.) The evidence Dodd presented at the hearing included redacted copies of the original and amended certification form. (*Id.* at 24.) Mr. Dodd "redacted information off the paperwork because

---

[3] Given that Plaintiff said he would not accept the waiver in any event, this appears to be immaterial.

8

[he] believed it was personal and private to [Plaintiff] and [tried] to protect his privacy and did not see it pertinent to the investigation." (*Id.* at 34.) During the hearing, Mr. Dodd stated:

On . . . #3A, on both of them for the medical diagnosis that was written in there I have whited out and took blue ink and scribbled it out to make . . . the medical diagnosis unreadable.

(ECF No. 26-1, at 151.)

### E.    Plaintiff's Termination

On September 8, 2015, Wagner informed Plaintiff, via letter, that he was terminated from employment. (ECF No. 26-1, at 100.) The letter stated, "The evidence in the transcript has proven you are guilty as charged. For your responsibility in the incident outlined above, you are hereby dismissed in all capacities with Norfolk Southern." (*Id.* at 182.) Plaintiff was terminated for "[c]onduct unbecoming an employee when [he] falsified information in [his] application for coverage under the Family and Medical Leave Act, submitted on August 7, 2015." (*Id.*)

Plaintiff's Union filed a series of appeals under the applicable labor contract in October and November of 2015. (ECF No. 26-1, pp. 182–90.) On May 17, 2016, the final appeal was denied by the Public Law Board 7579, the neutral arbitration body with jurisdiction over the dispute under the Railway Labor Act, 45 U.S.C. § 153 (2012). The Board concluded, "[s]ubstantial evidence support[s] the charges against [Plaintiff]. [Plaintiff] denied altering the application, but had no plausible explanation for how his application was changed. Regardless of how it became changed, [Plaintiff] remains responsible for the accuracy of the information he submitted." (ECF No. 26-1, at 191.) That was the final and binding arbitration award as to the dispute over Plaintiff's conduct and the charges filed against him.

On September 24, 2015, Plaintiff filed a claim against Norfolk with the United States Equal Employment Opportunity Commission (EEOC) Pittsburgh Area Office. (*Id.* at 192–96.) Plaintiff alleged disability discrimination under the ADA, 42 U.S.C. §§ 12101–12203 (2012) and retaliation

9

for seeking FMLA leave pursuant to 29 U.S.C. §§ 2611–2619 (2012). (*Id.*) He averred that he followed proper procedures, that Norfolk failed to accommodate him, and that Norfolk retaliated against him for requesting FMLA leave. (*Id.*) Plaintiff alleged that Norfolk did not offer him a leniency reinstatement, what he alleged was a railroad industry practice, which demonstrated that he was treated differently that other similarly situated employees, and that Norfolk terminated him for reasons other than falsifying documents. (*Id.*) Plaintiff believes he was also treated differently because Dodd refused to honor the waiver in his charging letter and the investigative hearing did not take place within ten (10) days, a requirement under the collective bargaining agreement. [4] (Keith Lavorgna Dep. 53–56, ECF No. 26-1.)

Plaintiff does not know any other Norfolk employee who falsified an FLMA leave application or other important work-related information, was accused of falsifying information, was charged with falsifying information, or was treated differently due to comparable behavior. (*Id.* at 52.) Plaintiff also does not know if any Norfolk employee has received leniency when they falsified information. (*Id.* at 58.) He testified that he does not know why Dodd would have had any problem with him because he took FMLA leave. (*Id.* at 56.) Plaintiff believes "if there was a problem with that form, all they had to do was tell [him] to take it back down" and correct it. (*Id.* at 57.) Plaintiff has only been disciplined once prior to the present issue when a supervisor pulled him out of service for taking a prolonged lunch break. (*Id.* at 24–25.)

Plaintiff filed this action on April 22, 2016, alleging two claims: (1) discrimination under the ADA; and (2) FMLA retaliation. (ECF No. 1.) Plaintiff claims he was terminated because he suffered migraine headaches and requested FMLA leave. (*Id.*) As to the first count, Norfolk allegedly "refused to work with Plaintiff in properly utilizing FMLA leave." (*Id.* ¶ 24(a).) As to

---

[4] This timing issue would appear to be an issue only under the labor agreement, unless Plaintiff could show that his case was treated less favorably than others, to his material prejudice. He offers no such evidence.

10

the second count, Norfolk allegedly retaliated against Plaintiff for requesting FMLA by accusing him of falsifying documents. (*Id.* ¶ 26.) Plaintiff claims Norfolk terminated him as soon as he submitted his FMLA request despite not having evidence that he falsified the documents.[5] (*Id.*)

In its Answer, Defendant Norfolk contends that Plaintiff was terminated because he falsified information on his FMLA leave application. (ECF No. 9.) Norfolk further contends that if it is found to have violated the FMLA, any such violation was not willful. (*Id.*)

Defendant then moved for summary judgment, filed a concise statement of material facts, and filed a brief and exhibits in support of its Motion on March 15, 2017. (ECF Nos. 24–27.) Plaintiff responded in opposition to Norfolk's Motion and filed a brief in support with exhibits on April 10, 2017. (ECF Nos. 28–30.) As noted above, he filed no rebuttal to Defendant's statement of facts. Defendant filed its reply brief to address Plaintiff's arguments and submitted recent, precedential case law with analysis to the Court on April 13, 2017. (ECF No. 31.) The Court has

---

[5] During oral argument, Plaintiff conceded that he admitted at his disciplinary hearing to altering the certification form to a degree (except for duration and frequency (ECF No. 26-1, at 132)) but seemingly argued that what was learned and determined at that hearing should be considered "after-acquired evidence," which is evidence obtained after an allegedly discriminatory adverse employment action that serves as a nondiscriminatory reason for such action. *See McKennon v. Nashville Banner Pub. Co.*, 513 U.S. 352, 362–63 (1995). The Court phrases the argument in that way because Plaintiff has not invoked that doctrine at all in his briefing, and only sort of seemed to do that in his counsel's rebuttal at oral argument. In essence, he alleges that Norfolk's falsification allegation could not have been valid until he had admitted to some level of altering the CHP form during his first internal disciplinary hearing and/or that hearing determined based on the evidence presented that he had acted as charged. Plaintiff, however, was not terminated until after the hearing. He claims that "the" adverse employment action therefore would be the initial suspension, and it would run until his first internal hearing. Generally, the after-acquired evidence doctrine serves to limit recovery as of the time the nondiscriminatory reason is discovered. *Id.* at 362. If this were applied here, Plaintiff could only recover damages for the time between his allegedly discriminatory suspension and his hearing. However, Plaintiff's arguably/potentially newly crafted argument misses the mark for a couple of reasons. First, Plaintiff's Complaint challenges his employment termination, not his suspension. (ECF No. 1 ¶¶ 22, 24(a), 27.) Plaintiff cannot, in effect, amend his Complaint via his oral argument in opposition to Defendants' motion for summary judgment. *See, e.g.*, *Pennsylvania ex rel. Zimmerman v. PepsiCo., Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) (holding that a plaintiff may not amend her complaint through arguments in opposition to a motion). Second, for the reasons noted above, at the time of the suspension, Defendant had plenty of reasons based on the notices from APS, and an examination of the various permutations of the submitted FMLA forms, to preliminarily reach the conclusion that was confirmed at the initial disciplinary hearing, that is that Plaintiff violated Defendant's previously published and generally applicable workplace rules. (ECF No. 26-1, at 132.) These events were essentially part of one transaction from the outset of the applicable disciplinary process, and the matter cannot be sliced as thinly as Plaintiff belatedly suggests.

11

considered all of the parties' papers and held oral argument on the Motion on June 20, 2017. The Motion is ripe for disposition.

## II. **STANDARD ON SUMMARY JUDGMENT**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The parties must support their position by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).

Once that burden has been met, the nonmoving party must set forth "specific facts showing that there is a *genuine issue for trial*," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (quoting Fed. R. Civ. P. 56(a), (e) (emphasis in *Matsushita*)). To meet its burden, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. The nonmoving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (emphasis omitted). Moreover, a party's labelling or characterizing a fact as "disputed" does not make it so—the record evidence the opposing party points to must support the dispute of fact, whether through reasonable inference or otherwise. If the nonmoving party's evidence merely is colorable or lacks sufficient probative force, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986).

In other words, summary judgment may be granted only if there exists no genuine issue of material fact that would permit a reasonable jury to find for the nonmoving party. *See id.* at 250. "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968); *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (quoting *Matsushita*, 475 U.S. at 587).

In reviewing the record evidence, the court draws all reasonable inferences in favor of the nonmoving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Matsushita*, 475 U.S. at 587–88; *Huston*, 568 F.3d at 104 (citations omitted). It is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations. *See Anderson*, 477 U.S. at 255; *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004); *Boyle v. Cnty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. "Where the defendant is the moving party, the initial burden is on the defendant to show that the plaintiff has failed to establish one or more essential elements to his case." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 589 (3d Cir. 2005) (citing *Celotex Corp.*, 477 U.S. at 322).

## III. DISCUSSION

Lavorgna asserts a discrimination claim based on his disability pursuant to the ADA and a retaliation claim pursuant to the FMLA. The Court will address his ADA claim first.

### A. Disability Discrimination

Plaintiff's disability claim is analyzed according the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To prevail, Plaintiff must

13

first establish a prima facie case of discrimination. *Id.* If he can, the burden of production shifts to Norfolk to articulate a legitimate, nondiscriminatory rationale for the allegedly discriminatory action. *Id.* at 802. The burden then shifts back to Plaintiff to establish by a preponderance of the evidence that Norfolk's stated reason is pretextual. *Id.* at 804; *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015).

Count I of Plaintiff's Complaint alleges disability-based discrimination in violation of the ADA, 42 U.S.C. § 12101, *et seq.* The ADA prohibits discrimination against a qualified individual with a disability because of that disability. 42 U.S.C. § 12112(a). Thus, in order to establish his prima facie case, Plaintiff must demonstrate that: (1) he is a disabled person within the meaning of the ADA; (2) he is qualified to perform the essential functions of the job, with or without reasonable accommodations; and (3) he has suffered an adverse employment decision as a result of such discrimination. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 580 (3d Cir. 1998). Norfolk only challenges the third element of the prima facie case. Def's Br. in Supp. of Mot. for Summ. J. 17, ECF No. 27.)

### 1. Prima Facie Case

Norfolk concedes that Plaintiff can satisfy the first two elements: Plaintiff is disabled under the ADA and he was qualified to perform the essential job functions of a conductor. Norfolk contends, however, that Plaintiff cannot establish that he has suffered an adverse employment decision as a result of disability discrimination. The record reflects that none of Plaintiff's supervisors, or any employee at Norfolk for that matter, were aware that he suffered migraine headaches prior to the FMLA investigation. Plaintiff's FMLA application was processed by APS and he requested FMLA through APS. When Plaintiff previously had asked his trainmaster what he should do if he had to take medication for anything, the trainmaster responded, "[I]f you have

14

to mark off, we have an extra board that covers you. Don't worry about that. We want you to be focused at work and not tear things up or damage things or get someone hurt." (Keith Lavorgna Dep. 67, ECF No. 26-1.) In fact, it was Plaintiff's trainmaster who suggested that he apply for FMLA leave.

Notably, in his Brief in Opposition, ECF No. 29, Plaintiff does not make *any* arguments to support his claim for disability discrimination, and on that basis alone, the Court could treat it as having been abandoned. Plaintiff instead devotes the entire brief to supporting his FMLA retaliation claim. In his Complaint, Plaintiff summarily alleges that Norfolk terminated him in violation of the ADA, 42 U.S.C. § 12114(b)(4), because he suffered from migraine headaches. (Compl. ¶ 23, ECF No. 1.) According to Plaintiff, as soon as Norfolk "had a pre-text for terminating Plaintiff they utilized it." (*Id.* ¶ 24(a), ECF No. 1.)

The record here is devoid of any factual support for what is, in reality, Plaintiff's conclusory position that he was fired by Norfolk because he had migraine headaches. Plaintiff had been approved for FMLA leave for five or six years for that very condition by the time his certification form was called into question by APS, which addressed those FMLA issues independently of Norfolk management. Plaintiff testified that prior to the investigation, his supervisors were not aware of his claimed disability. (Keith Lavorgna Dep. 29–30, ECF No. 26-1.) Plaintiff's supervisor became aware of Plaintiff's claimed disability only during the culmination of the inquiries through ASP's investigation. By the time his supervisor became aware of Plaintiff's asserted disability, APS had obtained Ms. Morgan's letter, was in possession of the conflicting forms, told Norfolk that Plaintiff likely altered the certification forms, and sent the information to Norfolk's labor relations department. The factual record that has been presented to the Court cuts in only one direction, which is that there is no basis to conclude that historically

15

Defendant had had any issue with Plaintiff's migraine headache condition, and the only allegation made as to a relationship between that condition and Plaintiff's dismissal was that he had migraine headaches (which his employer did not know previously) and was dismissed. He proffers no factual basis to conclude that there was any causal link between those two things.

Because there is no sufficient record evidence advanced that would support a causal connection between Plaintiff's termination and his claimed disability, Plaintiff fails to establish a prima facie case for ADA-disability discrimination.

## 2. Pretext

Even if Plaintiff could make out a prima facie claim of ADA discrimination, Norfolk provided a nondiscriminatory reason for his termination: Plaintiff falsified his FMLA certification in violation of Norfolk's employee policies. In order to demonstrate that Norfolk's stated reason for Plaintiff's termination was pretextual, Plaintiff must "point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Plaintiff must do more than show that Defendant's decision was wrong or mistaken; rather, he must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision." *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (emphasis omitted).

The record here presents no evidence of pretext. Plaintiff's internal investigative hearing required by his collective bargaining agreement and subsequent hearing under the jurisdiction of the Public Law Board focused on his allegedly falsified FMLA certification form. Presiding

officers from both appeals believed there was sufficient documentation that Plaintiff falsified his FMLA certification. The court does not analyze whether the results of these hearings were wrong. *See Burton*, 707 F.3d at 427. The analysis is whether a factfinder could disbelieve Norfolk's reason for terminating Plaintiff or an "invidious discriminatory reason was more likely than not a motivating or determinative cause." *Id.* Plaintiff has failed to submit record evidence that Norfolk terminated him for any reason other than for falsifying documents. Plaintiff, after all, essentially admitted to doing what he was charged with doing by his acknowledgment that he had personally added information to the submitted FMLA form. (ECF No. 26-1, at 132–33.) His further explanation, offered at the first internal hearing on August 26, that it was possible that one of his adult children or one of their friends might have added to that form while it was unattended on his kitchen table during his absence was never more than an offer of rank speculation. (ECF No. 26-1, at 138). There is also no record basis advanced that the Norfolk decision makers actually did not believe or rely on the conclusion that Plaintiff had in fact altered the FMLA form, which would be the hallmark of a finding of pretext by a jury. Further, the final appeal level of his disciplinary process, the neutral Public Law Board, reached the same conclusion. It is simply not pretextual for Norfolk to reply upon the decision of that tribunal. *See Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118–19 (2d Cir. 2002); *Brinson v. N.Y.C. Transit Auth.*, 60 F. Supp. 2d 23, 29 (E.D.N.Y. 1999). Finally, there is no record evidence that Norfolk somehow manipulated the outcome of the disciplinary hearings, or that some novel procedure was used in Plaintiff's case. In fact, all of the record evidence and Defendant's unrebutted concise statement of material facts cuts only in the opposite direction.

There is no sufficient record evidence from which a reasonable jury could conclude that Norfolk's proffered reason for Plaintiff's demotion was a pretext for unlawful discrimination under the ADA.

### 3. Accommodation

In Count I, Plaintiff also alleges that "Defendant refused to engage in the interactive process of accommodation in violation of the ADA." (Compl. ¶ 24, ECF No. 1.) Plaintiff considers his request for FMLA leave a reasonable accommodation under the ADA. (*Id.* ¶ 24(a).) "A plaintiff bringing an ADA failure-to-accommodate claim must establish: '(1) he was disabled and his employer knew it; (2) he requested an accommodation or assistance; (3) his employer did not make a good faith effort to assist; and (4) he could have been reasonably accommodated.'" *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)).

Here, the record reveals that Plaintiff enjoyed five or six years of approved FMLA leave. (ECF No. 26-1, at 88–91.) The Court need not make a conclusive determination as to whether FMLA leave is a reasonable accommodation under the ADA in this case or others, but it certainly seems that it would be in circumstances where that was what the employee sought, it was granted by the employer, and doing so did not appear to negatively impact either the employee's working conditions or the employer's operations. Plaintiff received that accommodation for ten (10) days in 2013 and for fourteen (14) days in 2014. (*Id.*) The undisputed record here was that Norfolk was more than willing to grant leave for Plaintiff's 2015 anticipated absences for the same condition, and this would have happened in the normal course but for all of Plaintiff's machinations with his FMLA form. There is zero record evidence that Norfolk was beginning to apply some new, harsher standard to Plaintiff's 2015 FMLA request, or that it in any way erected some new or higher bar

18

for him to pass over. In all regards, the record before the Court demonstrates that the factual account presented to Plaintiff's employer revealed that Plaintiff, and Plaintiff alone, is the author of his own tale of woe. The only issues with his FMLA request were procedural and material—it was incomplete (and he was given the chance to fix it), followed by his own addition of information that was required to come from the medical provider, not him. In such circumstances, he cannot now successfully claim at trial that Norfolk failed to reasonably accommodate him by not allowing him to utilize FMLA leave for his migraines. It did just that for years, and the record is uncontradicted that it was ready to do so again.

Because Plaintiff is unable to advance record evidence to support his claim that he was discriminated against because of a migraine disability, no reasonable jury could find that Norfolk violated the ADA. The Court grants Norfolk's Motion for Summary Judgment as to Count I.

## B. FMLA Retaliation

Plaintiff claims Norfolk retaliated against him for requesting FMLA leave by accusing him of falsifying documents as a pretext to terminate him. To prevail on his retaliation claim under the FMLA, Plaintiff must prove that: (1) he invoked his right to FMLA-qualifying leave; (2) he suffered an adverse employment decision; and (3) the adverse action was causally related to his invocation of rights. *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301–02 (3d Cir. 2012); *see also Ross v. Gilhuly*, 755 F.3d 185, 193 (3d Cir. 2014). To the extent that FMLA retaliation claims require a plaintiff to show proof of retaliatory intent on behalf of the employer, courts assess these claims under the *McDonnell* burden-shifting framework. *Lichtenstein*, 691 F.3d at 302. To that end, the Court will analyze Plaintiff's FMLA retaliation claim with the same analysis that was applied to his ADA disability discrimination claim. At the prima facie stage,

however, "a plaintiff alleging retaliation has a lesser causal burden." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 259 (3d Cir. 2017).

In *Carvalho-Grevious*, our Court of Appeals "decline[d] . . . to heighten the plaintiff's prima facie burden to meet h[is] ultimate burden of persuasion." *Id.* The court analyzed the effect of requiring the plaintiff to prove but-for causation at the preliminary, prima facie stage. *Id.* Ultimately, it agreed with the analysis used by the Fourth Circuit: "[i]f plaintiff can prove but-for causation at the prima facie stage, they will necessarily be able to satisfy their ultimate burden of persuasion without proceeding through the pretext analysis." *Id.* (quoting *Foster v. Univ. of Maryland–E. Shore*, 787 F.3d 243, 251 (4th Cir. 2015)). This would render the *McDonnell Douglas* burden shifting unnecessary. *Carvalho-Grevious*, 851 F.3d at 259. Instead, the Court of Appeals held that "the plaintiff must produce evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse [employment] action.'" *Id.* (quoting *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (alteration in original) (emphasis omitted)).

Here, the issue is whether Plaintiff has advanced evidence from which a reasonable jury *could* conclude that Plaintiff's FMLA leave request was "the likely reason" Norfolk terminated his employment. Then, whether a reasonable jury could find that Norfolk's nondiscriminatory explanation (stage two) was pretext (stage three). *See id.*

Norfolk concedes for purposes of addressing this Motion that Plaintiff satisfies the first two elements of his prima facie case under *Lichtenstein. See Lichtenstein*, 691 F.3d at 302. As to the third element, Plaintiff must demonstrate a causal connection between his termination and his request for FMLA leave. *See id.* A plaintiff can show a causal link by "proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of

20

antagonism, or temporal proximity." *Carvalho-Grevious*, 851 F.3d at 260 (citing *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 921 (3d Cir. 1997); *Shaner v. Synthes*, 204 F.3d 494, 505 (3d Cir. 2000).

The record shows that Norfolk was consistent, from "Day One," in its belief that Plaintiff falsified his FMLA certification form based on the information provided to it by APS and then via the various hearings held on the matter. Norfolk relied on the certification forms, Morgan's letter, APS's information gleaned from Morgan's office, and the employee handbook during its investigation. It reviewed the results of the initial hearing before terminating Plaintiff's employment. The Public Law Board, a statutory arbitration body with jurisdiction over the dispute, considered a developed record before affirming Plaintiff's termination. CSMF ¶ 12, ECF No. 25; ECF No. 26-1, at 191. At no point during the investigation, hearing, or appeals did Norfolk provide or rely on any other basis for Plaintiff's termination, and Plaintiff fails to advance any evidence of any inconsistent explanation by Norfolk for its decision. There is no evidence that Norfolk was inconsistent in its explanation for terminating Plaintiff's employment.

The record also does not show any pattern of antagonism toward Plaintiff on the part of Norfolk. In fact, the record reveals Norfolk was supportive of Plaintiff's taking FMLA leave for years. Plaintiff did not begin requesting FMLA leave until his trainmaster introduced him to the option. His trainmaster did not want him coming to work on medication and told him, "[I]f you have to mark off, we have an extra board that covers you. Don't worry about that. We want you to be focused at work and not tear things up or damage things or get someone hurt." (Keith Lavorgna Dep. 67, ECF No. 26-1.) He asked Plaintiff, "Did you apply for FMLA?" (*Id.* at 26:19–20.) Plaintiff then had not, but subsequently submitted an FLMA application and that application was approved. Plaintiff enjoyed years of FMLA leave before this issue arose. Furthermore, Plaintiff

21

himself cannot recall any workplace issues with his supervisors other than a singular disciplinary action after Plaintiff took a prolonged lunch break. The record evidence before the Court demonstrates that there is not even a hint that Norfolk was going to be resistant to Plaintiff's 2015 FMLA request. The trouble only began when the doctoring of Plaintiff's FMLA form came to light via APS. Plaintiff has failed to proffer record evidence that Norfolk had a pattern of antagonism against him at all for any reasons, let alone for taking FMLA leave.

Plaintiff also claims there is a temporal connection between his request for FMLA leave and his termination. He was taken off duty and charged on August 21, 2015, and terminated after an investigative hearing on September 8, 2015, roughly two weeks later. Because his supervisor became aware of his asserted disability only after Norfolk commenced its investigation, Plaintiff claims this two-week window is the window of time to be considered and is evidence of a level of temporal proximity supporting a causal link between his FMLA request and his termination. The Court disagrees.

Our Court of Appeals has held that even a short time between a protected activity and an adverse employment action alone is not "unusually suggestive of retaliatory motive." *Motto v. Wal-Mart Stores E., LP*, 563 F. App'x 160, 163 (3d Cir. 2014) (quoting *Shaner*, 204 F.3d at 505). In *Motto*, the plaintiff claimed that the eleven-day period between his sexual harassment complaint and his termination proved causation. *Id.* at 163 ("The crux of [plaintiff's] causation argument on this appeal is that the short time between his complaint about sexual harassment and his discharge, eleven days, is sufficient by itself to show a causal link."). The Court of Appeals disagreed and attributed the time period to "how long it took [plaintiff's supervisor] to properly investigate the situation and reach a decision." *Id.*; *see also Reid v. Sleepy's, LLC*, No. 14-cv-2006, 2016 WL 3345521, at *19–20 (M.D. Pa. June 16, 2016) (citing *Motto*'s temporal proximity analysis). The

Court of Appeals explained that "[i]n situations where the time between the protected activity and the retaliation does not, standing alone, support a finding of causation, there is usually evidence of antagonism or retaliatory animus in the intervening time." *Motto*, 563 F. App'x at 164. The Court affirmed the district court's dismissal of the retaliation claim. *Id.* at 164–65.

Here, Plaintiff argues that there was a short period of time between when Norfolk (as opposed to APS) became aware of Plaintiff's FMLA renewal application and his termination in an effort to prove causation by temporal proximity. Similar to *Motto*, Plaintiff's termination was the result of an investigation. It took Norfolk the two weeks at issue to conduct a hearing and reach a decision. That short time period is not in and of itself "unusually suggestive of retaliatory motive." *Id.* at 163. There is no evidence in the record to show "antagonism or retaliatory animus in the intervening time." *Id.* at 164. The period of two weeks, standing alone, does not raise an inference of causation. *Id.* Beyond that, arguably Plaintiff's protected FMLA activity was the submission of his FMLA request on July 7, 2015, and the earliest possible adverse action was his suspension six (6) weeks later, which longer period of time is also not suggestive of unlawful motivation.

But even if Plaintiff could make out a prima facie claim of FMLA retaliation, Norfolk has provided a nondiscriminatory reason for its termination, which the record reveals it actually relied upon: Plaintiff falsified his FMLA certification form in violation of Norfolk's employee policies. Plaintiff responds that Norfolk never sufficiently proved that he falsified the form because they relied on Morgan's letter that she did not change the form and Norfolk did not thereafter interrogate her. Furthermore, Plaintiff argues that Norfolk really does not know who altered the form simply because Morgan denied changing it.

It is well established, however, that Plaintiff "cannot simply show that the employer's decision was wrong or mistaken" in proving pretext. *Fuentes*, 35 F.3d at 765; *see Motto*, 563 F.

App'x at 164 ("It does not matter what a jury might conclude, based on evaluating the credibility of witnesses . . . . The only question is whether [defendant's] stated reason for firing [plaintiff] was pretext."); *see also Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 533 (3d Cir. 1992). The record fails to show evidence of pretext on Norfolk's part. It appropriately relied upon information received from APS before suspending him from duty, and terminated his employment only after a further investigation and a hearing conducted under the applicable labor agreement. A statutory arbitration body then affirmed that termination decision. Plaintiff has advanced no record evidence that would support a finding that Norfolk used some new or different standard for how it considered the statements provided by Morgan or the other information from APS as Norfolk was making the suspension or discharge decisions. There is no record evidence that Plaintiff's disciplinary proceedings were conducted in some novel fashion, and the Court is not aware of any provision in federal law that would dictate some alternative evidentiary standards to be applied by the employer in conducting its disciplinary proceedings (or that unique standards were applied to Plaintiff here). The Court is not in a position to hold that pretext could be established simply by the fact that Norfolk did not summon Morgan as a live witness at some stage of the disciplinary proceeding, or by the fact that it elected to rely on what would appear to be a facially reliable written submission from Morgan (along with all of the other evidence strongly suggestive of Plaintiff's responsibility for the alterations), particularly when there is nothing advanced that would call its reliability into question. [6] There is simply no evidence advanced by Plaintiff from which a jury could rationally conclude either that Norfolk did not actually believe in, and then rely upon, its stated reason for Plaintiff's dismissal, that such stated reason is unworthy of credence, or

---

[6] Plaintiff did seem to allude both in his disciplinary hearings and then in the Complaint in this Court to an argument that while he was away from home for work, friends of his adult daughter who were present at his house may have altered the FMLA form. (Compl. ¶ 13(d), ECF No. 1.) He has at no point advanced any record facts to move that assertion from highly implausible speculation to admissible evidence. (*See* ECF No. 26-1, at 138.)

that Norfolk (for the first time after years of approval) had in 2015 decided to fire him for requesting FMLA leave. *See Capps*, 847 F.3d at 152. Thus, the Court concludes that the record before it cannot plausibly support a conclusion that Norfolk's articulated reason of falsifying an FMLA form was pretextually used to retaliate against him for requesting FMLA leave.

Considering the record in the light most favorable to Plaintiff, he has not produced, nor has the Court's independent review of the record revealed, that there is sufficient record evidence to allow Plaintiff's ADA discrimination or FMLA retaliation claims to go to a jury. He has offered no sufficient record evidence that would support a verdict in his favor that Norfolk unlawfully discriminated against him in contravention of the ADA or the FMLA. Summary judgment is therefore appropriate as to all claims advanced by Plaintiff.

## IV. CONCLUSION

Accordingly, the Court grants Norfolk's Motion for Summary Judgment at ECF No. 24 against Plaintiff as to all claims. An appropriate Order will issue.

Mark R. Hornak
United States District Judge

Date: October 31, 2017

cc:     All counsel of record